# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **APRIL D. CHANDLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 10-S-2961-NW** |
| | ) | |
| **VOLUNTEERS OF AMERICA,** | ) | |
| **NORTH ALABAMA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

Plaintiff, April Chandler, commenced this action against her former employer, Volunteers of America, North Alabama, Inc. ("Volunteers"), under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), for racial discrimination and disparate treatment, a racially hostile work environment, and retaliation.[1]  Defendant moved for summary judgment as to all of plaintiff's claims.[2]  Defendant also moved to strike four declarations submitted by plaintiff in opposition to summary judgment.[3]  Upon consideration of the motions, briefs, and evidentiary submissions, the court concludes that defendant's motion for

---

[1] *See* doc. no. 1 (Complaint).  Plaintiff's complaint did not explicitly delineate these three claims in separate causes of action.  Even so, the court discerns from the allegations she did make, and the arguments she asserted in her brief, that these are the claims she is attempting to assert.

[2] Doc. no. 37.

[3] Doc. no. 50 (Defendant's Motion to Strike).

summary judgment is due to be granted in part and denied in part.  Defendant's

motion to strike also is due to be granted in part and denied in part.

## I.  MOTION TO STRIKE

**A.    Legal Standard**

The Eleventh Circuit has held that "a party cannot give 'clear answers to

unambiguous questions' in a deposition and thereafter raise an issue of material fact

in a contradictory affidavit that fails to explain the contradiction." *Rollins v.

TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (quoting *Van T. Junkins and

Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).  The

Eleventh Circuit has cautioned, however, that this so-called "sham affidavit" rule

should be applied "'sparingly because of the harsh effect it may have on a party's

case.'" *Nichols v. Volunteers of America, North Alabama, Inc.,* 470 F. App'x 757,

761 (11th Cir. 2012) (quoting *Latimer v. Roaring Toyz, Inc.,* 601 F.3d 1224, 1237

(11th Cir. 2010)).

> [T]he court must be careful to distinguish "between discrepancies which
> create transparent shams and discrepancies which create an issue of
> credibility or go to the weight of the evidence." *Tippens v. Celotex
> Corp.*, 805 F.2d 949, 953 (11th Cir.1986).
>
> [E]very discrepancy contained in an affidavit does not
> justify a district court's refusal to give credence to such evidence.
> In light of the jury's role in resolving questions of credibility, a
> district court should not reject the content of an affidavit even if

2

it is at odds with statements made in an early deposition.

*Id.* at 954 (quoting *Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 894
(5th Cir.1980)) (alteration in original) (citation omitted).

*Faulk v. Volunteers of America*, 444 F. App'x 316, 318 (11th Cir. 2011) (first

bracketed alteration supplied, second bracketed alteration in original).

## B.    The Four Declarations

Defendant moved to strike four declarations, filed by plaintiff as evidentiary

support for her opposition to summary judgment, as sham affidavits.  Plaintiff filed

two of the contested declarations, and two former employees of Volunteers, Sonja

King and Latina Fuqua, were the declarants in the remaining two affidavits.  In

response to defendant's motion, plaintiff has submitted additional declarations.

### 1.    Declarations of April Chandler

Plaintiff, April Chandler, was deposed on April 6, 2011.[4]  The deposition

commenced about 10:00 a.m. and concluded at 6:00 p.m, producing a transcript of

325 pages.[5]  At the outset of the deposition, plaintiff's attorney, Michael Weathers,

stated that plaintiff wished to reserve her right to "read and sign," *i.e.*, to review a

---

[4] Doc. no. 51-1 (Deposition of April Chandler), at 1.  Due to the length of plaintiff's
deposition, it was divided between two documents in the court file, number 51-1 and 51-2.
However, the transcript pages are continuously paginated across the two docketed files.  For
simplicity, the court will cite the deposition as "Deposition of April Chandler, at [page number],"
regardless of whether the cited page is found in document number 51-1 or 51-2.

[5] *Id.* at 6, 325.

transcript of the deposition and to correct any errors in the transcribed text.[6]  In addition to her deposition testimony, the record contains two declarations sworn out by plaintiff.  The first, dated September 9, 2011, is five pages in length.[7]  The second, dated September 30, 2011, is twenty-two pages in length.[8]  The September 9th affidavit was originally submitted in another case, styled *Sonja King v. Volunteers of America, North Alabama, Inc.*, Civil Action No. 08-S-856-NW, in which it was offered as evidentiary support in opposition to a motion for summary judgment.[9]  Plaintiff does not make a single citation to her September 9th declaration in her brief.  Additionally, that declaration does not include any information that is not found in Chandler's deposition or her September 30th declaration, so the court will disregard it.

Defendant argues that Chandler's September 30th declaration should be stricken because it contradicts her previous sworn deposition testimony, and because it is largely based on information not within Chandler's personal knowledge.[10]  As plaintiff points out, it would be inappropriate to strike her entire affidavit if only

---

[6] *Id.* at 7.

[7] *See* doc. no. 57-13 (Affidavit of April Chandler, September 9, 2011).

[8] *See* doc. no. 57-4 (Declaration of April Chandler, September 30, 2011)

[9] Although she submitted a declaration in the *King* case, plaintiff was not deposed in that case.  *See* Deposition of April Chandler, at 8 (testifying that she had never been deposed before).

[10] Motion to strike, at 25

certain portions of the affidavit are alleged to be inconsistent with her prior deposition testimony.

After a close review of all of the challenged statements in plaintiff's September 30th declaration, the court only finds one statement to be so inherently contradictory to plaintiff's prior deposition testimony that it must be rejected as a "sham." During her deposition, Chandler testified:

> I know on these occasions that I was called out to go on that Amy Johnson [and] Melissa Castle refused to go because they did not want to work in those African-American homes. . . . I know that because even on occasions *when we've had behavioral aide meetings*, they will stress that they did not feel comfortable working in those homes.[11]

Id. (emphasis and bracketed alteration supplied). Amy Johnson and Melissa Castle were white Volunteers employees who held the same position as plaintiff at the relevant time: HM-II.[12]

In her declaration, Chandler stated: "After I was given the HM II position on May 29, 2007, Stephenson created a whole different job description for me, a job Stephenson called 'Behavioral Aide Services,' which VOANA referred to in my deposition as 'direct patient care.'"[13]  As the emphasized material contained in the preceding block quotation makes clear, however, the Behavioral Aide program was

---

[11] Deposition of April Chandler, at 59 (emphasis and bracketed alteration supplied).

[12] *See id.* at 59, 66.

[13] Declaration of April Chandler, September 30, 2011, at 2.

not exclusively created for or staffed by Chandler.   Thus, her assertion that Stephenson created the position for her will be disregarded as a sham.

The remainder of the declaration statements challenged by defendant are not as inherently contradictory to plaintiff's prior deposition testimony.   In many instances, plaintiff's declaration merely clarifies statements she made in her depositions.  In other instances, the declaration sets forth facts that were not discussed at all during the deposition.  The fact that plaintiff felt the need to make so many changes to her prior testimony will serve as excellent ammunition for impeachment at trial, and it may go a long way toward supporting a challenge to plaintiff's credibility.  But a question of credibility is not sufficient to deem a sworn statement a "sham."

### 2.    Declaration of Sonja King

The next declaration that defendant challenges is that of Sonja King.   On September 21, 2011, King swore out a thirty-eight-page declaration.   Defendant attacks her declaration, not because it contradicts prior sworn testimony, but because it is "simply and entirely irrelevant, and because King lacks personal knowledge" of the issues in the case.[14]   However, the court need not strike the declaration as a sham affidavit merely because it contains some irrelevant testimony.  The court is capable

---

[14] Motion to strike, at 20.

of identifying relevant evidence in examining the factual record.  Almost every evidentiary submission offered in support of, or opposition to, summary judgment contains at least *some* irrelevant information.  Thus, with regard to the declaration of Sonja King, defendant's motion to strike is due to be denied.

### 3.    Declaration of Latina Fuqua

Finally, defendant moves to strike the declarations of Latina Fuqua.  On May 6, 2011, Fuqua swore out a seven-page declaration.[15]  On May 10, 2011, Fuqua swore out a declaration of five pages.[16]  Defendant argues that Fuqua's May 6th declaration should be stricken because it contradicts her May 10th declaration.  In response, plaintiff submitted another declaration of Fuqua, dated October 25, 2011.[17]  In that declaration, Fuqua stated that Kimberly Kelley, one of the attorneys representing defendant, coerced her into signing the May 10th declaration, the contents of which did not accurately reflect the testimony she gave Kelley.[18]  Defendant characterizes Fuqua's story as an "outrageous, appalling lie[] that should be disregarded by this Court."[19]  In response, plaintiff filed yet another declaration by Fuqua, in which she

---

[15] *See* doc. no. 57-18 (Declaration of Latina Fuqua, May 6, 2011).

[16] *See* doc. no. 61-5 (Affidavit of Latina Fuqua, May 10, 2011).

[17] *See* doc. no. 67-1 (Affidavit of Latina Fuqua, October 25, 2011).

[18] *Id.* at 2.

[19] Reply at 2.

stated that her May 6th and October 25th declarations are truthful.[20]

In her May 6th declaration, Fuqua stated that she has personally observed racial discrimination at Volunteers.[21] She stated that she witnessed Volunteers management personnel retaliate against plaintiff for speaking out in opposition to racial discrimination.[22] Her May 10th declaration contrasts sharply with that testimony. In that declaration, she stated that she never observed plaintiff make any complaints about racial discrimination or retaliation.[23]

Although the contradictions in the May 6th and May 10th declarations are glaring, they alone are not sufficient to justify striking the May 6th declaration. The May 6th declaration does not contradict *prior* sworn testimony, as defendant argues that it contradicts only the May 10th declaration. A declaration, unlike a deposition transcript, does not give the court the benefit of the questions that prompted Fuqua to give her testimony: *i.e.*, it is not possible to tell whether her statements were "clear answers to unambiguous questions." *Bryant*, 428 F. App'x at 897. Because the May 6th declaration came prior in time to the other sworn declaration it purportedly contradicts, it cannot accurately be characterized a "sham."

---

[20] *See* doc. no. 72-2 (Affidavit of Latina Fuqua, April 5, 2012).

[21] Declaration of Latina Fuqua, May 6, 2011, at 1-2.

[22] *Id.* at 3.

[23] Declaration of Latina Fuqua ¶ 5.

Defendant also argues that the content of the May 6 declaration is not relevant to plaintiff's claims. For the same reason that the court rejected defendant's relevance argument with regard to the King declaration, it rejects that argument with regard to the Fuqua declaration of May 6. Accordingly, with regard to the Fuqua declaration, defendant's motion to strike is due to be denied.[24]

## C.    Summary

In summary, defendant's motion strike will be granted in part and denied in part. The court will disregard plaintiff's statement in her declaration that Stephenson created the Behavioral Aide position solely for her as a retaliatory act. In all other aspects, the motion to strike will be denied.

## II.  MOTION FOR SUMMARY JUDGMENT

## A.    Legal Standard

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In other words, summary judgment is proper "after adequate time for discovery and upon

---

[24] In her response to the motion to strike, plaintiff argues that the May 10 declaration is due to be stricken. However, such action is not necessary, as any contradictions in the statements must be resolved in plaintiff's favor at summary judgment.

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'" *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284-85 (11th Cir. 1997)).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921); s*ee also Anderson v.*

10

*Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## B.    Factual Background[25]

### 1.    Volunteers of America, North Alabama, Inc.

Defendant, Volunteers of America, North Alabama, Inc. ("Volunteers"), provides group home care and instruction for developmentally challenged adults and adolescents.[26]  Volunteers operates several group homes in the Florence, Alabama area.[27]  Each of those homes is designated by a number, *e.g.*, "House 87."[28]  House 96-B is designated as the "Day Rehabilitation" center, which is a training facility for

---

[25] At the summary judgment stage, the court must "recount the facts in the light most favorable to . . . the non-moving party." *Wood v. Kesler*, 323 F.3d 872, 875 n.1 (11th Cir. 2003). "For that reason, what [is] set out in this opinion as 'the facts' for summary judgment purposes may not be the actual facts." *Id. See also, e.g., Matthews v. Crosby*, 480 F.3d 1265, 1269 (11th Cir. 2007) (same). Defendant, and several of the witnesses who provided testimony, vehemently dispute the veracity of much of the material presented herein.

[26] *See* doc. no. 39-8 (Affidavit of DeAnna Ferguson) ¶ 5.  Effective January 1, 2011, Volunteers was merged into Volunteers of America, Southeast. *See, e.g.*, doc. no. 57-5 (Deposition of Victor Hollis Tucker), at 8-9.  Following the merger, job titles were changed, *e.g.*, the "House Manager 2" position became "Residential Supervisor." *See* doc. no. 51-4 (Deposition of Lois Nicole Jones), at 19.  However, both parties consistently refer to the positions by the names used before the merger, and defendant has continued to refer to itself as "Volunteers of America, North Alabama." *See, e.g.* doc. no. 37 (Motion for Summary Judgment).  Thus, the court will also use the pre-merger terms.

[27] *See* Affidavit of DeAnna Ferguson ¶ 5.

[28] *See* Deposition of April Chandler, at 113; Declaration of April Chandler, Sept. 30, 2011, at 16.

patients, including some who reside at other Volunteers group homes.[29]  Furthermore,

Volunteers provides in-home care to some non-resident patients through contracts

with government agencies, such as local Departments of Human Resources and the

Scope 310 Authority of the City of Florence.[30]

Defendant's employees who are directly responsible for patient care and

instruction are called "House Managers."  There are two levels of House Managers.

A House Manager 1 ("HM-1") primarily is responsible for the direct care of the

patients.[31]  An HM-1 reports directly to a House Manager 2 ("HM-2"), whose primary

responsibility is supervising HM-1s.[32]  The HM-2s report to Service Coordinators,

who in turn report to the Program Director.[33]

### 2.    Plaintiff's employment at Volunteers

Plaintiff, April Chandler, is an African-American ("black") female.[34]  She was

---

[29] *See* Deposition of April Chandler, at 46; Deposition of Lois Nicole Jones, at 34.

[30] *See* Deposition of April Chandler, at 23 (testifying that Volunteers had a contract with Scope 310).  Scope 310 is a program sponsored by the city of Florence, Alabama.  "The purpose of the [Scope 310] Board is to plan action leading to the combating of all forms of mental retardation and other disabilities.  This action includes conducting pertinent information studies, providing appropriate services to the area through local agencies, and contracting with the State Department of Mental Health and Mental Retardation . . ."  City of Florence Website, http://www.florenceal.org/Administration /City_Boards /Scope_310/index.html (last visited April 12, 2012).

[31] *See* doc. no. 57-11, at 1-2 (Job Description, House Manager 1).

[32] *See id.* at 3-4 (Job Description, House Manager 2).

[33] *See id.* at 3, doc. no. 57-8 (Deposition of Teresa Stephenson), at 16 (testifying that a Service Coordinator was directly supervised by the Program Director).

[34] *Id.* at 11.

hired by Volunteers as an HM-1 on August 3, 2005.[35]  She was initially assigned to House 16, where she provided direct care to patients.[36]  In May of 2006, Chandler requested to be reassigned to the Day Rehabilitation program, and she was transferred to an HM-1 position in that program.[37]  On May 29, 2007, she was promoted to HM-2.[38]  As an HM-2, Chandler reported directly to Service Coordinators Bonnie Davis and Nicole Jones, both of whom are Caucasian ("white").[39]  Davis and Jones reported to Program Director Teresa Stephenson, who also is white.[40]  Volunteers terminated Chandler's employment on May 4, 2011.[41]  Her discharge is not at issue in this case.[42]

### a.    Events of September 2006

Early in her employment with Volunteers, Chandler was a subordinate of Sonja King, a black Service Coordinator.[43]  On the night of September 10, 2006, Teresa Stephenson called Chandler and told her to write a statement about how King was

---

[35] Doc. no. 39-9 (Affidavit of Kimberly O'Neal), at Ex. A (Payroll Cover Sheet).

[36] Deposition of April Chandler, at 49.

[37] Declaration of April Chandler, Sept. 30, 2011, at 6.

[38] Affidavit of Kimberly O'Neal, at Ex. B (Payroll Change Notice).

[39] *See* Deposition of Lois Nicole Jones, at 27 (testifying that she was Chandler's direct supervisor from September 2009 to January 2011); Deposition of April Chandler, at 96 ("I have to report to my initial supervisor, which, at that time, was Bonnie Davis.").

[40] *See* Deposition of Lois Nicole Jones, at 43.

[41] Declaration of April Chandler, Sept. 30, 2011, at 4.

[42] Chandler filed a new EEOC charge following her termination.  At the time she filed her response to Volunteers' motion for summary judgment, the EEOC had not concluded its investigation of the allegations in her charge.  Declaration of April Chandler, Sept. 30, 2011, at 22.

[43] *See* Declaration of Sonja King, at 2, 28.

mistreating her.[44]  Stephenson specifically instructed Chandler regarding the contents of the statement.[45]  Stephenson told Chandler that she was going to use the statement against King in retaliation for King reporting discrimination and racial harassment at Volunteers.[46]  Chandler, fearing for her own job, wrote exactly what Stephenson told her to write, even though the statements about King were false.[47]  Chandler then brought the handwritten statement to Stephenson's home, where Stephenson pressured her to sign it.[48]  However, Chandler refused to sign the false statement.[49] Stephenson or another Volunteers employee wrote Chandler's name at the bottom of the note and placed it in King's personnel file.[50]  King was placed on administrative leave, and eventually discharged.[51]

The following day, September 11, 2006, Chandler was removed from her position at the Day Rehabilitation program, which had been a day shift assignment,

---

[44] Declaration of April Chandler, Sept 30, 2011, at 6.

[45] Deposition of April Chandler, at 161-63.

[46] *Id.* at 162; Declaration of April Chandler, Sept. 30, 2011, at 7.

[47] Declaration of April Chandler, Sept 30, 2011, at 8; *see also* Deposition of April Chandler, at 161-63.

[48] Declaration of April Chandler, Sept 30, 2011, at 8; *see also* Deposition of April Chandler, at 164-65.

[49] Declaration of April Chandler, Sept 30, 2011, at 8; *see also* Deposition of April Chandler, at 162.

[50] Declaration of April Chandler, Sept. 30, 2011, at 9; Deposition of Teresa Stephenson, at 57 ("Somebody wrote 'April Chandler' there.  I don't remember if I did that of [*sic*:  or] Cordia Brown did that or Robin Bucklin.  Somebody wrote that, that's not April's handwriting.").

[51] Declaration of Sonja King at 35, 37.

and placed on an overnight shift at House 88.[52]  Her new assignment, like her previous one, was an HM-1 position.[53]  However, working at night was burdensome for Chandler, who has a special needs child.[54]  Chandler had to hire someone to watch her child at night, and the child subsequently had behavioral problems at school.[55]  Prior to her transfer to House 88, Chandler had worked only day shifts.[56]  The transfer increased the stress of Chandler's job, and it put her at greater risk of physical harm, because the patients at House 88 "were oftentimes violent, had a history of elopement, had a history of inappropriate sexual activity and touching, and had a history of assaulting and battering" each other and Volunteers staff.[57]  Chandler's position at the Day Rehabilitation center was given to Rebecca Hallmark, Stephenson's mother.[58]  Chandler believes that the position at the Day Rehabilitation center was taken away from her in retaliation for her refusal to sign the statement Stephenson instructed her to write about King.[59]

---

[52] Declaration of April Chandler, Sept. 30, 2011, at 9.

[53] Deposition of April Chandler, at 49.

[54] Declaration of April Chandler, Sept. 30, 2011, at 10.

[55] *Id.* at 10-11.

[56] *Id.* at 12.

[57] *Id.* at 13. "Elopement" is the noun form of the verb "elope." An archaic definition of elope is "[t]o run away; escape." *Black's Law Dictionary*, Elope, p. 560 (8th Ed. 2004).

[58] *Id.* at 9.

[59] Declaration of April Chandler, Sept. 30, 2011, at 11-12.

15

### b.    Chandler's promotion to HM-2 and "Behavior Aide" duties

Although Chandler frequently told Stephenson that working at nights created financial and personal hardships for her, she remained on the night shift at House 88 for over seven months, until May 29, 2007.[60]  At that time, she was promoted to HM-2, and moved to the day shift.[61]  Chandler continued as a day shift HM-2 at House 88 until July 28, 2008.[62]  It is unclear where she was transferred on that date, but by the time of her deposition in April of 2011, Chandler had an office at the Day Rehabilitation center, and some measure of responsibility for Houses 26, 63, and 87.[63]

The official job description for the HM-2 position states that the HM-2 "is responsible for the direct care and training/supervision of mentally retarded individuals as directed by the Service Coordinator and outlined in the Individual service plan."[64]  The principal activities listed in the job description include numerous supervisory responsibilities, such as monitoring staff performance, training HM-1s, and managing group homes.[65]  The list of principal activities also includes assisting in managing the health and safety of all assigned patients, covering other positions

---

[60] *Id.* at 13.

[61] *See id.*; Affidavit of Kimberly O'Neal, at Ex. B (Payroll Change Notice).

[62] Declaration of April Chandler, Sept. 30, 2011, at 12-13.

[63] *Id.* at 17-18.

[64] Job Description, House Manager 2, at 3.

[65] *Id.* at 3-4.

16

when short-staffed, and performing "other reasonably related duties as assigned by supervisory and/or administrative staff."[66]  Finally, the job description states that Volunteers "reserves the right to revise or change job duties and responsibilities as the need arises."[67]

Chandler testified that, generally speaking, HM-2s do not perform direct patient care.[68]  However, she also stated that, at the time of her deposition, Volunteers was understaffed.[69]  When there is a shortage of HM-1s, HM-2s may be called upon to work a shift in one of the group homes.[70]  Chandler also stated that, following her promotion, she "did not have to perform direct care services . . . except on limited occasions."[71]  She does not know whether other HM-2s have actually been required to perform direct patient care.[72]

After Chandler was promoted to HM-2, Stephenson assigned her some tasks as a "Behavioral Aide," providing direct care to patients outside Volunteers group

---

[66] *Id.* at 4.

[67] *Id.*

[68] Deposition of April Chandler, at 57.

[69] *Id.*

[70] *Id.* at 57-58.

[71] Declaration of April Chandler, Sept. 30, 2011, at 13.

[72] Deposition of April Chandler, at 58 ("Q:  Do you know one way or the other whether other [HM-2s] have to do direct patient care?  A:  I do not.") (bracketed alteration supplied).

homes.[73]  Chandler testified that she was singled out for those direct care assignments

when white employees would refuse them because they did not want to work with

black patients.  However, plaintiff also admitted that she did not know whether white

employees had actually refused the assignments she eventually received.[74]  She stated

that Stephenson required her to provide in-home care to people who were not patients

of Volunteers, but of various government agencies.[75]  However, she also testified that

Volunteers had a contract with one of those government agencies, and that the

patients (or, presumably, their families) were paying Volunteers for services.[76]  She

testified that those direct care assignments were sometimes in dangerous locations,

causing her to require a police escort in coming and going.[77]  Chandler stated that

---

[73] Declaration of April Chandler, at 2-3.

[74] Deposition of April Chandler, at 77.  Chandler testified

To be able to speculate and say whether or not whom Teresa called first on those occasions because it was so many, I cannot. . . .  I can't speculate on whether Teresa called them because I wasn't on the in when Teresa called them.  I can only speculate on the things that I witnessed and that I am aware of.  That I received a phone call sending me out.  And when we got in meetings to discuss, they verbalized that they did not feel comfortable going into those environments.

*Id.*

[75] Declaration of April Chandler, Sept. 30, 2011, at 3.

[76] Deposition of April Chandler, at 23 ("I think we had a contract with Scope 310 Authority to where we would — [Stephenson] needed people to go into the home and assist families.") (bracketed alteration supplied); *id.* at 69 ("Because when talking about the families — we had in place behavioral aide services.  So it wasn't a matter of who went.  They were paying for services.").

[77] Declaration of April Chandler, Sept. 30, 2011, at 3-4.

Stephenson threatened to reduce her hours if she did not provide direct care services. Stephenson also falsified timesheets to make it appear as if Chandler was working in House 88, when she was actually performing the Behavioral Aide duties.[78]  Chandler had to pay for all the gasoline expenses she incurred while traveling to different locations to perform direct care services as a Behavioral Aide.[79]  Stephenson last required Chandler to work as a Behavioral Aide in January of 2008.[80]

### c.    Chandler's administrative leave

Diana Vinson, who is white, was employed as an HM-1 from November 19, 2008 to June 22, 2009.[81]  She was still in her probationary period as an employee when she was fired.[82]  Stephenson and her husband, who works for the Lauderdale County Department of Human Resources ("DHR"), are the foster parents to Vinson's child.[83]  Vinson's direct supervisors at Volunteers were Chandler and Bonnie Davis.[84]  In early 2009, Chandler received a report that Vinson had abused a client, and she forwarded that report to Davis and Stephenson.[85]  Chandler testified that "nothing was

---

[78] *Id.* at 3-4.

[79] *Id.* at 4.

[80] *Id.* at 5.

[81] Affidavit of Kimberly O'Neal ¶ 34.

[82] *Id.*

[83] Deposition of Teresa Stephenson, at 25, 100.

[84] Deposition of April Chandler, at 128-29.

[85] *See, e.g.*, *id.* at 95.

done" following her report.[86]   Kimberly O'Neal, a human resources representative, stated that Vinson admitted to the abusive conduct, and she was "reprimanded" as a result.[87]   Vinson was not placed on leave, however, and DHR did not investigate her abusive action.[88]

Shortly after Chandler reported Vinson for abusing a patient, DHR received a report that Chandler had abused the same patient.[89]   DHR informed Stephenson of the alleged abuse on April 23, 2009.[90]   Chandler was placed on administrative leave while DHR and Volunteers each conducted investigations of the alleged abuse.[91]   While Chandler was on administrative leave, she met with Stephenson, Davis, and O'Neal.[92]   During that meeting, Chandler said that she felt like she and other black employees were being treated unfairly and subjected to discrimination.[93]   On April 29, O'Neal

---

[86] *Id.* at 128.

[87] Affidavit of Kimberly O'Neal ¶ 37.

[88] *See id.*

[89] *Id.* ¶ 17; Deposition of April Chandler, at 90.

[90] Affidavit of Kimberly O'Neal ¶ 18.  Plaintiff argues that, "[b]ecause of the Stephensons' relationship to Vinson and LCDHR," she cannot admit or deny this fact.  Doc. no. 56 (Response in Opposition to Summary Judgment), at 8.

[91] Deposition of April Chandler, at Ex. 2a (Memorandum of Administrative Leave).  *See also* Affidavit of Kimberly O'Neal ¶ 22 (stating that there were two concurrent investigations). Volunteers has placed white employees on administrative leave following allegations of abuse or neglect.  *Id.* ¶ 20.  However, the record contains no details on the circumstances of the allegations or investigations related to those employees.

[92] Deposition of April Chandler, at 165-66.

[93] *Id.*

sent Chandler a letter stating that the investigation had concluded and that she had been exonerated of any wrongdoing.[94]  The letter instructed Chandler to return to work on Thursday, April 30, but she did not receive the letter until the afternoon of Friday, May 1.[95]

### i.      Compensation for time on leave

Chandler returned to work on Monday, May 4.[96]  Chandler testified that, as an HM-2, she was always on call, and that if she had been called on Saturday, May 2 or Sunday, May 3, it would have constituted a work day.[97]  During her deposition, she stated that she did not work on May 2 or 3,[98] but she later clarified that, while she did not go into the office on May 2 or 3, she did receive work-related phone calls on those days.[99]  Because the investigation determined that Chandler had not done anything wrong, she should have been paid for the time that she was suspended, as

---

[94] Deposition of April Chandler, at Ex. 2b (Letter of April 29, 2009).

[95] Deposition of April Chandler, at 102, 105, 106, 107.

[96] *Id.* at 102 ("And Monday is when I reported back to work."); *id.* at 103 ("I didn't return back to work, I think, until May — whatever that Monday's date was. . . .  My physical first day back into the office would be on that Monday.").

[97] *Id.* at 103-04 ("So when I actually turned my phone on after talking to HR Department, if I needed to go out on that Saturday or that Sunday — my employment was still restored then on the weekend. . . .  [I]f my phone rung on Saturday, that's a workday.  If my phone rings on Sunday, that's a workday.")

[98] *Id.* at 104, 310-11.

[99] Declaration of April Chandler, Sept. 30, 2011, at 15.

if she had worked those days.[100]   However, Chandler testified that she was not paid

in full, because she received no compensation for any of the days from Thursday,

April 30, through Sunday, May 3rd.[101]   O'Neal, the human resources representative,

stated that Chandler was paid for 80 hours for the two-week pay period ending on

May 3, 2009.[102]   However, the only payroll document in the record indicates that she

was paid for 72.25 hours during that period:  she was credited with 40 hours for the

five working days from April 27th to May 1st, and she was paid for the 32.25 hours

she actually worked from April 20th to April 23rd.[103]   Chandler worked only three

hours on April 23rd, because she was placed on administrative leave that day.[104]   The

payroll records do not indicate that she was paid for the half day of work she was

forced to miss on the 23rd, or the full day she missed on the 24th.[105]

> ## *ii.*   Revelation of confidential information to subordinates

While Chandler was on administrative leave, Davis told Markia Nelson, Latina

Fuqua, and Jennifer Shaffer, three HM-1s, that Chandler was on leave for abusing a

---

[100] *See* Deposition of April Chandler, at 100.

[101] *Id.* at 102-03.

[102] Affidavit of Kimberly O'Neal ¶¶ 31-32.

[103] Deposition of April Chandler, at Ex. 22 (Payroll Records).

[104] Deposition of April Chandler, at 310 ("I was taken off [*sic*:  placed on] leave on the 23rd. My shift starts at 8:00 p.m., [*sic*:  a.m.] ended at 5:00.  That's a half day pay I missed."); Payroll Records (showing that she worked from 7:54 a.m. to 11:00 a.m. on April 23rd).

[105] *See* Payroll Records.

patient.[106]   Although Nelson and Fuqua were Chandler's direct subordinates, Davis

told them to listen only to Davis's instructions, and to disregard what Chandler told

them.[107]   Chandler testified that no employee other than Vinson ever refused to

comply with her instructions.[108]   Under company policy, Chandler's leave status was

confidential.[109]   Chandler reported that Davis told Fuqua and Nelson about her leave,

and Stephenson spoke to Davis about the incident.[110]   In that "oral counseling,"

Stephenson reminded Davis of "the importance of privacy and never disclosing

confidential information."[111]   The document memorializing the counseling includes

a disclaimer that it "is not a disciplinary action . . . ."[112]

On May 5, 2009, shortly after returning to work, Chandler filed an EEOC

---

[106] Doc. no. 51-3 (Deposition of Markia Nelson), at 17; Declaration of Latina Fuqua, May 6, 2011, at 1, 6; doc. no. 39-3 (Declaration of Jennifer Shaffer), at 1-2.  Nelson testified that Davis told her that another employee, Dana Watts, was also placed on leave.  Deposition of Markia Nelson, at 22.

[107] Deposition of April Chandler, at 176, 183 ("Q:  Do you allege Ms. Davis told any other employees not to listen to you?  A:  Yes, I do. . . . I know those two came forth and told me that she did:  Markia Nelson and Jennifer Shaffer.").  Nelson herself testified that she had no recollection of Davis telling her to disregard Chandler's instructions.  Deposition of Markia Nelson, at 36, 91.  For the purposes of summary judgment, the court will assume Davis *did* tell Nelson to disregard Chandler's instructions.

[108] Deposition of April Chandler, at 178-79.

[109] Affidavit of Kimberly O'Neal ¶ 26.

[110] Affidavit of Kimberly O'Neal, at Ex C (Memorandum of Oral Counseling).

[111] *Id.*

[112] *Id.*

charge.[113]   In her charge, she alleged that she was subjected to adverse terms and conditions of employment and retaliation.[114]   She stated that Davis had leaked confidential information about her, that she was forced to provide direct care to patients whom white employees had refused to serve, and that she was placed on administrative leave in retaliation for reporting abuse by Vinson.[115]   Davis then told Shaffer that Chandler had filed an EEOC charge, and that Chandler could not be trusted.[116]   On July 14, 2009, Chandler filled out another EEOC questionnaire, alleging Davis's statements to Shaffer constituted further discrimination and retaliation.[117]

### iii.   Investigation of allegations of abuse by white employee

At some point in late 2010, Nicole Jones was accused of abusing a patient.[118] Specifically, Jones was accused of grabbing a patient by the arm and dragging or

---

[113] *See* doc. no. 18-1 (EEOC Charge, May 5, 2009).   Chandler completed the EEOC questionnaire on May 4th, her first day back at work, and filed the charge itself on May 5th.   *See* doc. no. 39-2 (EEOC Questionnaires), at 7.

[114] EEOC Charge, May 5, 2009.

[115] *See id.*

[116] Deposition of April Chandler, at 175-76.

[117] EEOC Questionnaires, at 9-11.

[118] *See, e.g.*, Deposition of Lois Nicole Jones, at 111.   Tasha Anderson stated that Jones was pregnant at the time.   Doc. no. 57-16 (Deposition of Tasha Anderson), at 92.   Jones was on maternity leave for the first three months of 2011.   Deposition of Lois Nicole Jones, at 28.

jerking him into another room.[119]   Debra Scott, the Quality Enforcement Coordinator, and Allen Robinson, the Senior Human Resources Representative, conducted an investigation into the incident.[120]   Scott and Jones testified that the investigation was conducted on the same day as the alleged abuse; Tasha Anderson, another Volunteers employee, testified that the investigation was conducted on a different day, although she was unsure what day that was.[121]   Scott and Robinson went to the Day Rehabilitation center, where the alleged abuse occurred, and interviewed witnesses, including the patient, Wendy English, and Jessie Watkins.[122]   Scott determined that Jones was not responsible for any abuse, and the investigation was concluded.[123]   Jones was not placed on administrative leave during the course of the investigation.[124]   Several black employees were upset that Jones was exonerated without being placed on leave during the investigation, while Dexter Stewart, a black employee, was on leave at the time pending an investigation of alleged patient abuse.[125]

---

[119] *See, e.g.*, Deposition of Lois Nicole Jones, at 111, 113; doc. no. 39-14 (Affidavit of Wendy English) ¶ 7; doc. no. 51-5 (Affidavit of Jessie Watkins) ¶ 7.

[120] Doc. no. 39-13 (Affidavit of Debra Scott), at 3-4.

[121] Deposition of Tasha Anderson, at 36.

[122] Affidavit of Debra Scott, at 6; Deposition of Lois Nicole Jones, at 113-14.  English was an HM-1 at the time.  *See* Affidavit of Wendy English ¶ 4 (stating that she was promoted to HM-2 in December 2010).  Watkins was the "One-on-One" HM-1 assigned to be with the patient Jones allegedly abused at all times.  Affidavit of Jessie Watkins ¶ 7.

[123] Affidavit of Debra Scott, at 7.

[124] Deposition of Lois Nicole Jones, at 114.

[125] Deposition of April Chandler, at 276.

### 3.    Treatment of Black Employees at Volunteers

Chandler stated that Stephenson had a policy of "constantly us[ing] African-American employees against each other."[126]   In 2006, around the same time that Stephenson instructed Chandler to write the note describing King's mistreatment of her, she told King to get rid of Chandler, because she wanted Chandler's "black ass gone."[127]   Additionally, Shirley Harden, a black HM-1, testified that her work environment was intolerably stressful.[128]   Her stress stemmed from her co-workers' belief that Stephenson and Nicole Jones had hired her to "spy" on other black employees.[129]   Several of Harden's co-workers told her that they believed she was a spy.[130]   Harden never testified that Stephenson and Jones actually instructed her to spy.[131]   However, she stated that the spying accusations made her feel that Stephenson and Jones put her in an inappropriate position.[132]   She stated that the stress threatened

---

[126] Declaration of April Chandler, Sept. 20, 2011, at 6 (bracketed alteration supplied).

[127] Declaration of Sonja King, at 28.

[128] Doc. no. 57-20 (Deposition of Shirley Harden), at 14.

[129] *Id.* at 20 ("[W]hen I went to House 87 . . . several coworkers that were there [were] under the impression . . . that I was hired to spy for Nicole Jones and Teresa Stephenson.") (bracketed alterations supplied).

[130] *Id.* at 20-21.

[131] *Cf. id.* at 28 ("Q:  Ms. Stephenson didn't tell you she was hiring you to spy, did she?  A: No, she didn't.  She didn't tell me that, but that was, you know, as far as — and to my understanding, she didn't clarify whether or not she had hired me to spy or not to the people that were believing that I was hired to be a spy.  She never did clarify that.").

[132] Deposition of Shirley Harden, at 29 ("Q:  When you said you were put in a position you shouldn't have [been], is that concerning this allegation that you contend that you were hired to spy?

her health and forced her to resign from Volunteers.[133]

Markia Nelson testified that the "big" Volunteers people "stayed harder" on Chandler and her subordinates than they did on other employees.[134]  Nelson testified that the houses and employees under Chandler's supervision were written up for infractions that would result in no writeups for houses with white supervisors.[135]  Although Nelson did not actually see the conditions in the other houses, she testified that Volunteers' employees who worked in multiple houses were aware of the different standards applied to Chandler's houses.[136]  At the time Nelson worked at Volunteers, Chandler was the only black HM-2.[137]  Latina Fuqua stated that House 87, where Chandler was an HM-2, was written up for being disorderly and messy.[138]  Conversely, House 32, which was under the management of Wendy English, a white HM-2, was not written up, although it was in greater disarray.[139]

### a.    Offensive comments

Chandler testified that white employees at Volunteers, including her

---

A:  Right.").

[133] *Id.* at 14.

[134] Deposition of Markia Nelson, at 25-26.

[135] *Id.* at 26-30.

[136] *Id.* at 27-30.

[137] *Id.* at 28.

[138] Declaration of Latina Fuqua, at 5.

[139] *Id.* at 6.

supervisors, used the term "black" rather than "African-American."[140]   Chandler stated that, although she does not find the term "black" offensive in the abstract, the hateful way in which the word was used at Volunteers caused her to prefer that "African-American" be used instead.[141]   During her deposition, she frequently used the word "black" herself, but on some occasions she did so when explaining (what she speculates were) the unarticulated thought processes and motivations of white Volunteers employees.[142]

### *i.*    Stephenson's comments about black people

Chandler testified that Program Director Teresa Stephenson frequently made derogatory remarks about black Volunteers employees and black people in general. Chandler testified that some of those comments were related to her by Bonnie Davis, and that she personally witnessed Stephenson make them as well.[143]   Specifically, Stephenson said that the "body language [of black employees] was rude and they

---

[140] Deposition of April Chandler, at 11.

[141] *Id.* ("I prefer to refer to everyone as African American because I've heard the term black used so much with my employment there."); Declaration of April Chandler, September 30, 2011, at 15 ("I heard the term 'Black' used very derogatorily so many times while I worked at VOANA that I preferred that the term African-American be used instead to describe African-American employees.").

[142] *See, e.g.*, Deposition of April Chandler, at 196 ("The day that Nicole Jones got employed with Volunteers of America she had a problem with the black — we're going to use Volunteers of America terms because that's how they relate.").

[143] *Id.* at 111, 121-22.

28

came off [as] being smart."[144]  She said that black employees had tempers, and were

"snappy."[145]  Stephenson made those comments in front of black employees, and said

that "she was skeptical about even telling [black employees] general directions

because [they] all had attitudes."[146]  Chandler stated that Stephenson made comments

about black employees being rude and having bad body language whenever the two

had contact with each other.[147]  Stephenson told black employees to lower their voices

and to calm down even when they were already acting calmly.[148]  Chandler stated that

Stephenson made those comments "in a very demeaning, condescending, and hateful

tone of voice like she was talking to small children."[149]  Chandler also testified that,

on several occasions, Stephenson told her directly that Stephenson did not like black

people.[150]

Sonja King worked at Volunteers from July of 2002 until she was fired in

December of 2006.[151]  King was a Service Coordinator, whose office was close to

---

[144] *Id.* at 111 (bracketed alterations supplied).

[145] *Id.* at 112, 118.

[146] *Id.* at 118-19 (bracketed alterations supplied).

[147] *Id.* at 123.

[148] Deposition of April Chandler, at 123-24.

[149] Declaration of April Chandler, September 30, 2011, at 16.

[150] *Id.*

[151] Declaration of Sonja King, at 2.

Stephenson's.[152]   King could overhear what Stephenson said in her office.[153]   She

heard Stephenson make frequent, derogatory comments about black employees, and

black people generally.   Some of those comments included:

> "Black people have a nasty attitude; they're nasty; they're ignorant."

> "[I'm n]ot going to hire any black dudes here because they are drug dealers and might damage the clients."

> "Black clients have poop on their assess all of the time."

> "Old black women are good for nothing."

> "You know how black people are."

> "Like nigger trash."

> "She is too black."

> "All black guys are good for is to be in jail and drug dealers."

> "White girls who like black guys are 'nigger lovers.'"

> "All black people are good for is cleaning up poop off our client's asses."[154]

There is no indication in the record that Chandler personally overheard any of those

---

[152] *Id.* at 10.

[153] *Id.*

[154] *Id.* at 10-11.   This court "do[es] not explicate this vulgar language lightly, but only because its full consideration is essential to measure whether these words and this conduct could be read as having created 'an environment that a reasonable person would find hostile or abusive.'" *Reeves v. C.H. Robinson, Inc.*, 594 F.3d 798, 803 (11th Cir. 2010) (*en banc*) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

particular remarks.[155]

Stephenson told Chandler that Victor Tucker, the CEO of Volunteers, would "rubber stamp" any decisions she made, because Stephenson's husband works for DHR and brought Volunteers business.[156]  As a result, Stephenson "had full range to do pretty much what she wanted[,] whether it was right or wrong, beneficial for the company or not."[157]  Chandler testified that she was afraid of Stephenson; she "lived in fear every day that [she] was going to get fired.[158]

### ii.    Jones's comments about House 87

House 87 is located in the Norwood Park neighborhood of Florence.[159] Chandler lives in that neighborhood, as does Christine Noel, another black HM-2.[160] The residents of Norwood Park are predominantly black.[161]  Nicole Jones "always referred to that neighborhood as being a bad neighborhood and it wasn't safe, and she

---

[155] In her declaration, Chandler states that she heard Stephenson making derogatory comments about black people while in her office.  Declaration of April Chandler, September 30, 2011, at 5-6.  However, the comments she mentions having heard are the same as those outlined above, *e.g.*, that black people are rude and have bad attitudes — not the virulent remarks King heard.

[156] Declaration of April Chandler, Sept. 30, 2011, at 2.

[157] Deposition of April Chandler, at 52.

[158] *Id.* at 168 (bracketed alteration supplied).

[159] Doc. no. 39-11 (Affidavit of Christine Noel) ¶ 12.

[160] Deposition of April Chandler, at 113 ("I actually have purchased a home in that neighborhood so it offended me as well as Christine Noel, because she lives over there."); Affidavit of Christine Noel ¶¶ 3, 12.

[161] Declaration of April Chandler, Sept. 30, 2011, at 16.

31

didn't feel comfortable going over there."[162]   As a result, Chandler had to be the

"person that went over there and deal[t] with that because [Jones] did not want to go

in that neighborhood."[163]   Additionally, whenever Stephenson and other supervisors

would talk about dealing with families in a predominantly black neighborhood, they

would roll their eyes.[164]

During a staff meeting in 2010, Jones stated that she did not like to go to House

87, because it is in a dangerous neighborhood.[165]   In making that statement, she

specified that it was a black neighborhood.[166]   That comment offended several of the

people at the meeting who lived in the neighborhood, including Noel, who tried to get

Jones to explain her statement.[167]   Jones said she was especially uncomfortable in the

Norwood Park neighborhood after dark.[168]   Jones told her co-workers that, in the

middle of the night, while she was a student, she and a friend were accosted at

---

[162] Deposition of April Chandler, at 114.

[163] *Id.*

[164] *Id.* at 112.

[165] *Id.* at 115.

[166] *Id.* ("Her comment was that she didn't want to go there because it was a black neighborhood and that it was a dangerous neighborhood."); Deposition of Shirley Harden, at 25 ("And she said, 'Well I don't like them being over here anyway in this black,' and then she said, 'oh, in this neighborhood.'").

[167] Deposition of April Chandler, at 115-17.  Contrary to Chandler's testimony, Noel stated that she never heard Jones make those comments, and that the Norwood Park neighborhood is racially diverse.  Affidavit of Christine Noel ¶ 12.  However, at the summary judgment stage, the court will adopt Chandler's version of the story.

[168] Deposition of April Chandler, at 116.

gunpoint by two black men a few blocks from House 87, although they escaped

unharmed.[169]   Jones testified that, during that the staff meeting, the Volunteers

employees assigned to House 87 told her they "didn't want to take the trash out at

nighttime," because they "didn't feel safe."[170]

      **b.**    **Other issues**

      ***i.***    **Segregated lunches**

Chandler testified that employee lunches at Volunteers were often segregated

by race.  She stated that when Debra Scott, Lynn Sharpe, and Larry Ayers, white

corporate employees, would come to the Day Rehabilitation center, they would take

only white employees to lunch with them.[171]   Specifically, they would take Nicole

Jones and Brandi Springer, who were Service Coordinators.[172]  Barbara Dorsett, who

replaced Stephenson as Program Director in July of 2010,[173] testified she did not

recall any HM-1s or HM-2s being included in those lunches.[174]  Dorsett, who is black,

---

      [169] *Id.* at 113 ("Nicole's comment was that she had drove over there one time and two guys tried to open up her car door or something."); doc. no. 57-15 (Deposition of Ashley Thomas), at 54-55 ("Q:  Did she ever make any racially derogatory comments about anybody in your presence?  A:  No, not in my presence.  The only thing she — I remember her saying was like, about it being black guys that robbed her.").  *See also* Deposition of Lois Nicole Jones, at 41-44 (testifying that two men of unknown race attempted to rob her and a friend within a few blocks of House 87).

      [170] Deposition of Lois Nicole Jones, at 40.

      [171] Deposition of April Chandler, at 20.

      [172] *Id.* at 20-22; doc. no. 57-17 (Deposition of Barbara Dorsett), at 40.

      [173] Deposition of Barbara Dorsett, at 21.

      [174] *Id.* at 109.

also stated that  Scott and Sharpe would occasionally take Nicole Jones out to lunch, without inviting Dorsett.[175]

Chandler was vocal in complaining about the fact that she and other black employees were not invited to lunch with their white coworkers.[176]  She made those complaints both in the presence of her coworkers as they returned from lunch, and to Human Resources.[177]  Chandler testified that, on the occasions when black and white employees would eat in the same location, all of the white employees would sit at one table, and all of the black employees at another.[178]  Chandler acknowledged that there is no company policy requiring black and white employees to sit separately.[179]  She stated that she believes "the Caucasian employees did not sit with us [*i.e.*, black employees] because they had a problem sitting with us."[180]  Sometimes, "information about how HMII's were to do their jobs was given out and discussed at many of the meals" attended by only white employees, making it more difficult for plaintiff to perform her job.[181]

---

[175] *Id.* at 39-40 ("On occasion I would be invited, I guess, as the Program Director, usually by Brandy Springer but then she left.  After that I wasn't so much invited anymore."); *id* at, 110.

[176] Deposition of April Chandler, at 22.

[177] *Id.*

[178] *Id.* at 20.

[179] *Id.* at 21.

[180] *Id.* (bracketed alteration supplied).

[181] Declaration of April Chandler, Sept. 30, 2011, at 16.

### ii.    Employee leave

In 2010, Nicole Jones, a white Service Coordinator, was granted a week of leave for Thanksgiving.[182]    Chandler then requested a week of leave around Christmas.[183]  Chandler's request was denied because Volunteers was going through a merger and needed her to work in preparation for the change.[184]  Jones took FMLA maternity leave for the months of January, February, and March 2011.[185]  Markia Nelson, a black HM-1, was pregnant at the same time as Jones, but her application for FMLA leave was denied, and she was forced to quit her job in order to give birth.[186]

### iii.    Change in company vehicle policy

On April 1, 2011, five days before Chandler was deposed, Volunteers changed its policy on the use of company vehicles.[187]  Prior to that date, Chandler had been allowed to use company vans assigned to the Day Rehabilitation center to travel from her office, located there, to the other three houses over which she had authority.[188]

---

[182] Deposition of April Chandler, at 228.

[183] *Id.* at 227.

[184] *Id.* at 228-29 ("I placed the [request for] leave to be off during Christmas, and my leave was denied because we were getting ready to be accredited. . . .  So they felt like a leave was not to be taken during this time.") (bracketed alteration supplied).

[185] Deposition of Lois Nicole Jones, at 28.

[186] Deposition of Markia Nelson, at 10-13.

[187] Declaration of April Chandler, Sept. 30, 2011, at 17.

[188] *Id.*

Under the new policy, if she had to use a company van to transport a patient, she was required to drive her own vehicle to the house where that patient was, and use a van assigned to that particular house to transport the patient.[189]   Nicole Jones explained that the new policy was in place to save gasoline costs.[190]   Chandler testified that the policy could not have been intended to save gasoline costs, because Volunteers had given her a company credit card so she could buy fuel for the vans she used.[191]   After the policy change, Wendy English was still permitted to drive Day Rehabilitation vans to group homes.[192]

Chandler learned of the new policy regarding company vans from a sticky note placed on her office door.[193]   At some point after Stephenson left Volunteers, Nicole Jones stopped verbally communicating with Chandler; she placed sticky notes on Chandler's door, or used written memoranda, instead.[194]   Chandler found that practice offensive, as Jones did not afford her "common courtesy."[195]   Despite the fact that Chandler told Jones she would prefer verbal communications, Jones, and later Susan

---

[189] Deposition of April Chandler, at 41-43.

[190] *Id.* at 41.

[191] *Id.*

[192] *Id.* at 43 (testifying Chandler received the sticky note announcing the policy change on a Friday, and that Wendy English drove the van to another home on the following Monday).

[193] *Id.* at 16.

[194] *Id.* at 119.

[195] Deposition of April Chandler, at 120.

Minou, another white supervisor, continued to address her through the medium of sticky notes.[196]   Chandler testified that other employees "absolutely are not" communicated with by means of sticky notes.[197]

### 4.     Procedural Background

Chandler first filled out an EEOC questionnaire on May 4, 2009, the day she returned to work following administrative leave.[198]  She indicated that she had been discriminated against on the basis of race and retaliation.  In her answers to the questionnaire, Chandler made the following allegations: (1) that she was forced to write a false statement against another black employee; (2) that her job at the Day Rehabilitation center had been given to a white employee who was also Stephenson's mother; (3) that she was forced to do direct care in patients' homes, resulting in a reduction of her work hours; (4) that she was retaliated against for reporting Vinson for abuse, and for making complaints about Stephenson; (5) that Stephenson had turned black employees against each other; (6) that she was offered a shift that she could not work; and (7) that work hours were taken away from black employees and given to white employees.[199]  She filed an EEOC charge the next day, May 5, 2009.[200]

---

[196] *Id.* at 131-32.

[197] *Id.* at 134.

[198] EEOC Questionnaires, at 7.

[199] *Id.*

[200] EEOC Charge, May 5, 2009.

In her EEOC charge, Chandler made four allegations:  (1) that confidential information about her had been leaked; (2) that her job at the Day Rehabilitation center had been given to a white employee; (3) that she had to perform direct patient care services that had been refused by a white employee; and (4) that she had been placed on administrative leave for allegedly abusing a patient.[201]  She indicated that she was asserting discrimination on the basis of race and retaliation.  The earliest date of the alleged discrimination was November 1, 2008, and the most recent date was April 23, 2009.  Chandler filled out another EEOC questionnaire on July 14, 2009.[202]  She once again indicated that she had suffered discrimination due to race and retaliation.  In her second questionnaire, she added allegations that Davis told Chandler's white subordinates that they did not have to listen to Chandler, who was not to be trusted.[203]

During the course of the EEOC investigation, Volunteers was presented with a copy of Chandler's EEOC charge.[204]  The company did not receive copies of either of the questionnaires.[205]  The EEOC concluded its investigation, and issued Chandler

---

[201] *Id.*

[202] EEOC Questionnaires, at 9-11.

[203] *Id.* at 9.

[204] Affidavit of Kimberly O'Neal, at Ex. D (EEOC Notice of Charge).

[205] *See id.*

a right-to-sue letter, on August 3, 2010.[206] Chandler filed her complaint on November 2, 2010.[207] Chandler did not attach her EEOC charge or questionnaires to the complaint. The court granted her leave to file the EEOC charge and right-to-sue letter as exhibits to her complaint on April 18, 2011.[208]

## C.   Discussion

### 1.   Retaliation and hostile work environment claims

#### a.   Elements of the claims

To establish a *prima facie* claim for retaliation that will survive a motion for summary judgment, plaintiff must point to evidence demonstrating satisfaction of the following elements:  (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) there is a causal connection between her protected activity and the materially adverse action suffered. *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  "If the plaintiff makes out a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action." *Id.*  "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is

---

[206] Doc. no. 18-2 (Right-to-Sue Letter).

[207] Doc. no. 1.

[208] *See* doc. no. 18 (Notice of Filing Exhibits to Complaint).

39

pretextual." *Id.*[209]

> To prove her claim for a racially hostile work environment, plaintiff must show
>
> (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002) (citing

*Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir. 1999)) (alterations

supplied).

### b.    Defendant's arguments

Defendant asserted substantive, persuasive arguments as to why summary

judgment should be granted on plaintiff's retaliation and hostile work environment

claims.

### i.    Retaliation

With regard to plaintiff's retaliation claim, defendant argued that plaintiff had

failed to establish a *prima facie* case.  Specifically, defendant argued that plaintiff's

forwarding of a complaint that Diana Vinson had abused a client did not constitute

---

[209] *See* pages 68-72, *infra,* for a more thorough discussion of the *McDonnell-Douglas* analytical framework.

protected activity under Title VII, that there was no causal connection between plaintiff's complaint about Vinson and her subsequent placement on administrative leave, and that plaintiff's placement on administrative leave did not constitute an adverse employment action.  Further, while defendant does not dispute that plaintiff's filing of an EEOC charge was an activity protected by Title VII, defendant does assert that Bonnie Davis's act of telling plaintiff's subordinates they did not have to listen to her was not an adverse employment action.  Defendant's arguments are well-taken.  Plaintiff's report of Diana Vinson for abusing a client has nothing to do with Title VII.  A report of a co-worker's misconduct cannot be considered in the same manner as a report of discrimination or harassment.  Moreover, even though defendant may have failed to cite the correct standard for determining an adverse employment action in the retaliation context, the court concludes defendant nonetheless has made an initial showing that neither of defendant's allegedly retaliatory actions were "adverse," even under the correct standard.[210]

---

[210] *See Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006) ("We conclude that the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace.  We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant.  In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.").  Defendant appears to advance the "adverse employment action" standard that applies to claims of racially disparate treatment, *i.e.,* that only concrete, particularized employment actions that would materially alter the terms and conditions of the plaintiff's employment can constitute an "adverse employment action" for retaliation purposes.  *See* doc. no. 38, at 28 ("Chandler's placement on administrative leave was not an adverse employment action

## ii.    Hostile work environment

Defendant does not dispute that plaintiff belongs to a protected group, or that she was subjected to harassment that she found to be unwelcome.[211]   Even so, defendant denies that the harassment plaintiff allegedly suffered was based upon her race, and that it was sufficiently severe and pervasive to alter the terms and conditions of plaintiff's employment.   Defendant's argument on this point within the hostile work environment section of defendant's brief admittedly is brief:

> Like the plaintiff in *Wills v. Postmaster General,* Chandler provides examples of situations in which she felt mistreated (addressed herein previously), but she has failed to show that any of the incidents were tied to her race or that they altered the terms and conditions of her employment.  300 Fed. Appx. 748, 751 (11th Cir. 2008).  None of the alleged incidents were "severe."  Furthermore, even if accepted as true, these various isolated incidents (like being given post-it notes or being called "Black") are too few and too minor to be sufficiently "severe and pervasive" to establish a hostile working environment pursuant to Title VII.  *Id.*[212]

Despite the brevity of defendant's argument, the court concludes that defendant has pointed to sufficient facts to establish that summary judgment should be granted

---

because she was vindicated, reinstated, and her pay was never cut or delayed."), 30 ("Davis's alleged statement to Shaffer does not amount to an adverse employment action upon which Chandler can base her retaliation claim because Chandler fails to show her supervisory role was affected as a result of any alleged action by Davis.").

[211] *See* doc. no. 38, at 25.

[212] Doc. no. 38 (defendant's summary judgment brief), at 25-26 (footnote omitted).  The omitted footnote set forth the four factors to be considered in determining whether an allegedly hostile working environment satisfies the "severe and pervasive" element.

on the hostile work environment claim.  Defendant specifically references its prior discussion of plaintiff's allegations of mistreatment.  It must be acknowledged that the discussion was contained within the race discrimination, or disparate treatment, discussion section of defendant's brief, not the hostile work environment section. Even so, in that section, defendant states that "Chandler asserts that virtually everything under the sun constitutes race discrimination *or created a hostile work environment*."[213]  Defendant then drops a footnote containing eleven examples of plaintiff's allegations:

> Chandler alleges the following was race discrimination *and created a hostile work environment*[:] 1) Caucasian employees referring to African-Americans as "Black;" 2) Teresa Stephenson allegedly referring to unidentified African-American employees as "rude", [sic] asking them to lower their voices, and advising them to calm down when speaking to her; 3) Caucasian employees going to lunch together without inviting African-American employees; 4) Caucasian employees sitting together at company luncheons; 5) Nicole Jones allegedly stating that the neighborhood where group home number 87 is located is a "bad neighborhood"; 6) allegedly being asked to write negative statements about other African-American employees; 7) that the hours of Jerolyn Baugh, an African-American, were allegedly reduced and given to Melissa Castle-Hampton, a Caucasian VOANA employee; 8) <u>potentially</u> being unable to use the VOANA vans that were specifically located at the Day Rehabilitation Program; 9) Caucasian employees communicating with Chandler in writing; 10) being placed on administrative leave following a DHR report of alleged physical abuse of an individual VOANA serves; and 11) allegedly being assigned to work with difficult African-American families while Caucasian

---

[213] Doc. no. 38, at 14 (emphasis supplied).

employees were not.  (Chandler Depo at 11-12, 20-21, 113-117 and 123, 132, 158-161).[214]

Defendant then spends several pages of its brief arguing that many of these incidents did not constitute adverse employment actions because they did alter the terms and conditions of plaintiff's employment.[215]  While those arguments are offered in the context of defendant's discussion of plaintiff's claim that she was subjected to disparate treatment because of her race, they also inform the discussion of whether the actions allegedly taken against plaintiff were sufficiently severe or pervasive to alter the terms and conditions of her employment.  Further, while defendant might have achieved a greater level of clarity by repeating these assertions in the hostile work environment discussion section of its brief, the court finds that the failure to repeat the argument is not fatal to defendant's summary judgment motion, especially considering that defendant specifically referenced its prior discussion of plaintiff's allegations, and that, in the prior discussion, defendant specifically referred to how the facts discussed might relate to a hostile work environment claim.  The court at least knew from defendant's argument where to look to find the facts and record citations supporting defendant's argument.  Based on those facts, the court concludes

---

[214] *Id.* at 14 n.5. (italicized emphasis supplied, underlined emphasis in original, alterations supplied).

[215] *See id.* at 18-24.

that defendant has satisfied its initial burden of establishing that summary judgment should be granted plaintiff's hostile work environment claim.

###   c.   Plaintiff's response

In her brief in opposition to defendant's motion for summary judgment, plaintiff offered little to no argument to support her retaliation and hostile work environment claims.  In the "Retaliation" section of her brief, for example, plaintiff merely:  listed the elements of a retaliation claim; described the types of activities that are protected by the statute; made some general statements about what constitutes an adverse employment action in the context of a retaliation claim; and discussed in a desultory manner how to establish a causal connection between the allegedly adverse employment action and the plaintiff's protected activity.[216]  She then offered this lone sentence in the way of argument:   "*Chandler has met her burden regarding her retaliation claim under Title VII and § 1981.*"[217]

Plaintiff's argument about her hostile work environment claim is, if such can be imagined, even less developed.  In the "Hostile Work Environment" section of her brief, plaintiff made general statements about how a plaintiff can prove a hostile work environment claim, but she stopped short of actually setting forth the elements of the

---

[216] *See* doc. no. 56 (plaintiff's summary judgment brief), at 32-34.

[217] *Id.* at 34 (emphasis supplied).

claim.   Plaintiff also made a brief statement about how, under the so-called "continuing violation" doctrine, "a plaintiff's charge of discrimination regarding a hostile work environment is considered timely if 'an act contributing to the claim occurs within the filing period,' even if 'some of the component acts of the hostile work environment fall outside the statutory time period.'"[218]  Plaintiff then concluded the section with the following statement:   "*Such is the case with Chandler's claims of hostile environment under Title VII and § 1981.*"[219]

### c.    Analysis

With regard to the retaliation claim, plaintiff made no effort to explain her conclusory statement that she had satisfied her burden of establishing the claim.   At no point did she link facts to law, for the purpose of explicating those facts that satisfy the elements of a *prima facie* case, and those which demonstrate why defendant is not entitled to the judgment it seeks.   Nor did she dispute defendant's characterization of the protected activities in which she had engaged, or point out any other activities that might have been protected by Title VII.

With regard to the hostile work environment claim, she did not even go so far

---

[218] *Id.* at 35 (citing *Smiley v. Alabama Dept. of Transportation,* 778 F. Supp. 2d 1283 (M.D. Ala. 2011); *Reed v. Austal, USA, LLC,* No.08–00155–KD–N, 2011 WL 4435562 (S.D. Ala. Sept. 23, 2011)).

[219] *Id.* (emphasis supplied).

as to make a conclusory statement that the claim had been proven, but instead only barely asserted that the claim was timely.  Again, plaintiff did not make any effort to connect the evidence to the elements of the hostile work environment claim, or to explain why the court should not be persuaded by defendant's arguments in favor of summary judgment.  Specifically, plaintiff did not attempt to explain why any of the incidents identified by defendant, or any combination thereof, *did* constitute severe, pervasive, race-based harassment that altered the terms and conditions of plaintiff's employment.  She did not include any citations to the record, or references to other portions of the brief that might cite to the record.  From reading claimant's argument on hostile work environment, the court would not know where to look to find supporting evidence.  Nor would the court know which portions of defendant's argument are being challenged by plaintiff.

Even looking at the other argument sections of plaintiff's brief would not help direct the court to applicable portions of the record.  In the race discrimination/ disparate treatment section, plaintiff first makes arguments about who was the true decisionmaker with regard to the decision to terminate her employment.  When discussing whether she has sufficient circumstantial evidence to prove her case, plaintiff describes both the *McDonnell-Douglas* analytical framework and the alternative framework set forth in *Smith v. Lockheed Martin Corp.,* 644 F.3d 1321

(11th Cir. 2011), but then she makes only conclusory statements about whether either of those frameworks has been satisfied.  For example, plaintiff states that "The thrust of Chandler's argument is that Stephenson fostered an environment of pervasive racism, dishonesty, manipulation, and fear.  Discipline against black employees — including Chandler — was usually or mostly "fabricated and concocted."[220]  She also states that she has shown that "<u>any</u> reason given by VOANA for the relevant employment actions is a lie and that the <u>real</u> reason was Stephenson's discrimination."[221]  Finally, she states that "[t]here is extensive evidence with regard to Stephenson's 'vile, repugnant and inexcusable' expressions of racism.  The facts — taken in the light most favorable to Chandler — support an inference of discrimination."[222]  None of these statements direct the court to any evidence that might be helpful in assessing plaintiff's hostile work environment claim.  Similarly, in the retaliation discussion of plaintiff's brief, she makes general statements about the law on retaliation, then states only the following in the way of argument: "Chandler has met her burden regarding her retaliation claim under Title VII and § 1981."[223]  Once again, this statement does not assist the court in identifying any

---

[220] Doc. no. 56, at 31.

[221] *Id.* at 32 (emphasis in original).

[222] *Id.*

[223] *Id.* at 34.

evidence that might support plaintiff's hostile work environment claim. Absent any assistance from the discussion sections of plaintiff's brief, the court's only option would have been to attempt to discern from plaintiff's fact section which facts plaintiff intended to offer in support of her hostile work environment claim, and which portions of the evidentiary record might support those facts.

Perhaps plaintiff expects the court to perform those tasks for her, but it is not the court's responsibility to divine potential arguments not advanced or developed by the parties in their briefs. *See U.S. Steel Corp. v. Astrue,* 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a party's "perfunctory and underdeveloped argument") (citing *Flanigan's Enterprises, Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that "fail[ure] to elaborate or provide any citation of authority in support [of an argument]" results in waiver)) (bracketed alterations supplied). *See also Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir. 1997) (explaining that "the onus is upon the parties to formulate arguments"); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it").

This court is, of course, aware that it recently was reversed by the Eleventh Circuit for declining to reach the merits of a claim in a similar case brought on behalf

49

of another Volunteers employee by Michael Weathers, the same attorney who represents Chandler in this case.  In *Nichols v. Volunteers of America, North Alabama, Inc.,* Civil Action No. 3:08-cv-0501-CLS, this court found that Nichols had abandoned her claim for an unlawful, hostile work environment by offering no substantive response to Volunteers' well-supported arguments that summary judgment should be granted on that claim.[224]  In so holding, this court cited the same cases cited in the previous paragraph of this opinion.[225]

On appeal, a majority of the Eleventh Circuit panel chosen to review the case reversed this court's holding that plaintiff had abandoned her hostile work environment claim. *See Nichols v. Volunteers of America North Alabama, Inc.*, 470 F. App'x 757 (11th Cir. 2012) (*per curiam*).[226]  The majority pointed out that Nichols *had addressed* her hostile work environment claim, *albeit in the fact section of her summary judgment brief — not* the argument section.  *Id.* at 760-61.  In her proposed undisputed fact numbered "10," Nichols had stated:  "It was a racially hostile work

---

[224]  *Nichols v. Volunteers of America, North Alabama, Inc.*, Civil Action No. 3:08-cv-0501-CLS, doc. no. 57 (memorandum opinion and order entered on November 23, 2010), at 12.  Nichols had mentioned the words "harassment" and "hostile work environment" in some of the subheadings in her brief, and she had made a conclusory statement that she had been subjected to "severe and pervasive racially derogatory language," but this court held that those bare statements were not sufficient to refute Volunteers' *detailed arguments* that summary judgment should be granted on the hostile work environment claim.  *Id.* at 12-14.

[225]  *Id.* at 14-15 (citing *U.S. Steel,* 495 F.3d at 1287 n.13; *Flanigan's Enterprises, Inc.,* 242 F.3d at 987; *Lyes,* 126 F.3d at 1388; *Resolution Trust Corp.,* 43 F.3d at 599).

[226]  The panel included Judges Barkett, Pryor, and Kravitch.  *Nichols,* 470 F. App'x at 757.

environment at [Volunteers] every day."[227]   Nichols went on in the same paragraph of the factual portion of her brief to describe in detail the racially derogatory statements, slurs, and other harassing behavior that she allegedly was forced to endure on a frequent basis from her supervisor.[228]   The Eleventh Circuit panel concluded that Nichols had thereby "presented sufficient evidence to create a genuine issue of material fact about whether the harassment she allegedly suffered at Volunteers was severe or pervasive."  *Id.* at 760.   Accordingly, the Eleventh Circuit reversed this court's decision on the hostile work environment claim and remanded for further proceedings.  *Id.* at 761, 764.[229]

Judge Kravitch dissented from the panel majority's decision in *Nichols.*  In so doing, she relied primarily on the Eleventh Circuit's prior decision in *Case v. Eslinger,* 555 F.3d 1317 (11th Cir. 2009), in which the Court explained that, when the defendants moved for summary judgment on "all claims," and argued that they were

---

[227] *See Nichols v. Volunteers of America, North Alabama, Inc.*, Civil Action No. 3:08-cv-0501-CLS, doc. no. 47 (plaintiff's brief in opposition to summary judgment), at 6.  *See also Nichols,* 470 F. App'x at 760.

[228] *See Nichols v. Volunteers of America, North Alabama, Inc.*, Civil Action No. 3:08-cv-0501-CLS, doc. no. 47 (plaintiff's brief in opposition to summary judgment), at 6-8.  *See also Nichols,* 470 F. App'x at 760-61.  Notably, the individual about whose behavior Nichols primarily complained was Teresa Stephenson, the same individual of whose behavior Chandler complains in the present case.

[229] The Eleventh Circuit's decision was rendered on April 18, 2012, but it has not yet been issued as the mandate of the Court.  Consequently, no further proceedings have taken place in this court.

entitled to qualified immunity on certain of the plaintiff's claims, the plaintiff was "obliged to explain why the defendants were not entitled to qualified immunity." *Id.* at 1329.  Because the plaintiff had failed to do so, the Court in *Case* held that "he 'cannot readily complain about the entry of a summary judgment order that did not consider an argument [he] chose not to develop for the district court at the time of the summary judgment motions.'" *Id.* (quoting *Johnson v. Board of Regents of University of Georgia,* 263 F.3d 1234, 1264 (11th Cir. 2001)).  After explaining the *Case* decision, Judge Kravitch stated:

> Like the plaintiff in *Case*, Nichols failed to develop her hostile work environment claim at the time of Volunteers's summary judgment motion.  In her brief in opposition to summary judgment, Nichols never set out the elements of, or cited any legal authority for, a hostile work environment claim.  She never devoted a section or even a paragraph to explaining the specific facts that amounted to a hostile work environment.  Instead, she only mentioned hostile work environment in a conclusory manner — by explaining that, for example, she "reported the racially hostile working [sic] at [Volunteers]"— or in her headings, introduction, or conclusion, simply tacked on to enumerations of her discrimination and retaliation claims.

> It is clear from her brief that Nichols conflated "hostile work environment" with her discrimination and retaliation claims: Nichols set out the requisite elements for those other two claims, which are distinct from the hostile work environment elements, and developed legal argument for those claims.  But she failed entirely "to formulate arguments" about her hostile work environment claim, as our case law requires.  *Resolution Trust*, 43 F.3d at 599.  At no point did she link facts to law to "explain why [Volunteers was] not entitled" to the judgment it sought for the reasons Volunteers explained.  Because

Nichols was counseled throughout her case and, despite this, provided no legal or direct factual support for a hostile work environment claim, I am compelled to conclude that she did not adequately develop her claim at the summary judgment stage.

Importantly, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust*, 43 F.3d at 599. Requiring the district court to determine how the facts Nichols set out satisfied the elements of a hostile work environment claim, in the absence of any argument from Nichols, would be unduly burdensome and tantamount to obliging the district court to serve as counsel for Nichols, which we cannot do. *Cf. GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir.1998) (holding that, even in the case of a *pro se* litigant, the district court cannot "serve as *de facto* counsel for a party" or "rewrite an otherwise deficient pleading in order to sustain an action"), *overruled in part on other grounds as recognized in Randall v. Scott*, 610 F.3d 701, 709 (11th Cir.2010). Accordingly, I would affirm the portion of the district court's order finding that Nichols abandoned her hostile work environment claim.

*Nichols,* 470 F. App'x at 765-66 (Kravitch, J., dissenting) (footnote omitted, bracketed alterations in original).

In an attempt to read between the lines of the Eleventh Circuit's majority decision in *Nichols*, this court suspects that the panel majority may have been motivated to allow Nichols' hostile work environment claim, in spite of her attorney's failure to develop any argument on the claim, because the racially hostile behavior described in Nichols' proposed undisputed fact numbered 10 was so shockingly severe, including Stephenson's frequent use of the "N-word" and other derogatory,

demeaning language.  Perhaps the majority felt that it would have been unjust for Volunteers to escape responsibility for Stephenson's blatantly racially hostile behavior, even if plaintiff's attorney had failed to properly fulfill his professional duty and responsibility to make legal arguments on his client's behalf.

This court is sympathetic to those concerns.  There is no excuse for racism in the modern workplace or, for that matter, any place in the modern world; and this court is proud to play whatever part it can in remedying racist behavior brought to light by aggrieved employees.  Even so, the concerns highlighted by Judge Kravitch's dissent in *Nichols* cannot be ignored.  A district court must not cross the line between thoroughly examining the record and fairly construing the facts in favor of the non-moving party, on the one hand, and impermissibly advocating on a party's behalf, on the other.

It certainly is possible that there is evidence of racial hostility or retaliatory motivation in this case that is similar to the evidence of racial hostility set forth in *Nichols*; but if there be such evidence, it is buried even deeper in Chandler's brief, or in the evidentiary record, than it was in *Nichols*.  There are very few statements in the fact section of Chandler's brief that can reasonably be taken as directly supporting a claim for retaliation or hostile work environment without the need for further development or explanation by plaintiff.  For example, it is impossible to discern,

54

without further explanation, whether several of plaintiff's complaints (*i.e.,* about being forced to write a false statement about Sonja King, being terminated, and being denied the use of vans) are about retaliation, harassment, or racially disparate treatment, or a combination of one or more of those claims.  In other instances, plaintiff summarily states that certain of defendant's actions were retaliatory, but she does not connect that retaliation to any activity protected by Title VII.  *See, e.g., Rollins v. State of Florida Department of Law Enforcement,* 868 F.2d 397, 400 (11th Cir. 1989) (holding that statutorily-protected activity is not limited to formal complaints filed with the EEOC, but also includes those who voice complaints with their employers or make use of internal grievance procedures).  She also does not explain why those alleged actions should be considered adverse employment actions, or what evidence supports a causal connection between her protected activity and any adverse employment action. *See Dixon v. The Hallmark Companies, Inc.,* 627 F.3d 849, 856 (11th Cir. 2010) (setting forth the elements of a retaliation claim).  Plaintiff points to several comments and other behaviors (eye rolling, body language, tone of voice) that she presumably believes constituted harassment, but she makes no attempt to explain how she meets the legal requirements of establishing that the harassment was based upon her race, that it was sufficiently severe or pervasive to alter the terms and conditions of her employment, or that Volunteers should be held responsible for

the alleged harassment.  *See, e.g., Bivins v. Jeffers Vet Supply,* 873 F. Supp. 1500, 1507 (M.D. Ala. 1994) (setting forth the elements of a hostile work environment claim).  She also has not developed her assertion that the hostile work environment claim is timely under the continuing violation doctrine.

This court does not have the time or the inclination (and does not believe it has the duty) to unearth those arguments on plaintiff's behalf that should have been developed by her attorney, or to divine which factual assertions support which elements of which claims.  To proceed any further with the analysis of plaintiff's retaliation and hostile work environment claims would amount to little more than judicial guess work (*e.g.,* What claim might this fact support?  Which elements of the claims might be uncontested?  How might plaintiff challenge defendant's argument on this point?).  That, surely, is not the role of a district court, or the most efficient use of the court's limited resources.[230]

If this case reaches the Eleventh Circuit, and the Eleventh Circuit disagrees with this court's decision not to consider plaintiff's retaliation and hostile work environment claims, this court respectfully and earnestly requests guidance about how to proceed in future cases, particularly ones in which Michael Weathers is the

---

[230] This court speculates that an appellate court would reach a similar conclusion if it received an appellate brief that was equally lacking in substantive legal argument, or even if it was reviewing a district court's opinion that dismissed a claim on summary judgment without explaining how the plaintiff had failed to identify sufficient evidence to support the elements of her claim?

plaintiff's attorney.  Mr. Weathers currently has six cases pending in this district, and five of those cases are assigned to the undersigned judge.[231]  Mr. Weathers has filed five separate discrimination lawsuits against Volunteers, on behalf of five different plaintiffs (including Chandler and Nichols).[232]   His briefs are consistently disorganized *at best*, and confused and confounding at worst.  Mr. Weathers' motion practice transcends the oft-criticized concept of "shotgun pleading" to what this court will characterize as "mudball pleading."  He throws a disorganized mass of mess against the court wall and hopes that something will stick.  By way of example, plaintiff's response to defendant's statement of undisputed facts in this case is a quagmire of rambling assertions that are often unrelated to the facts alleged by defendant.  Plaintiff responded to many of defendant's facts by admitting them with clarification.   In many instances, that "clarification" is better characterized as obfuscation.  Likewise, the facts plaintiff recites in her denials are often unrelated to

---

[231] The five pending cases assigned to the undersigned include *Andazola v. Logan's Roadhouse, Inc.,* Civil Action No. 3:10-cv-0316-CLS; *Feeney v. Walgreens Health Initiatives, et al.,* Civil Action No. 3:10-cv-2961-CLS; *Hamilton v. Coffee Health Group, et al.,* Civil Action No. 3:10-cv-3621-CLS; *Thompson v. City of Muscle Shoals, Alabama, et al.,* Civil Action No. 3:12-cv-1686-CLS; and the present case.  Mr. Weathers currently has one other case in this district, and it is assigned to Chief Judge Sharon Lovelace Blackburn.  *Gross v. Birthday Direct, Inc.,* Civil Action No. 3:08-cv-1809-SLB.

[232] *See Nichols v. Volunteers of America, North Alabama, Inc.,* Civil Action No. 3:08-cv-0501-CLS; *Cooper v. Volunteers of America, North America, Inc.,* Civil Action No. 3:08-cv-0583-CLS; *Faulk v. Volunteers of America, North Alabama, Inc.,* Civil Action No. 3:08-cv-0591-SLB; *King v. Volunteers of America, North Alabama, Inc.,* Civil Action No. 3:08-cv-0856-CLS; and the present case.

the facts they purport to deny.[233]

To illustrate:  defendant's undisputed fact number 4 reads simply:  "An HM-1 reports to the HM-2 and a Service Coordinator and an HM-2 reports directly to a Service Coordinator."[234]   Plaintiff's "clarification" of that fact begins with the statement: "The chain of command was HM I reported to HM II who reported to a Service Coordinator, but everyone reported to Program Director, Teresa Stephenson . . . ."[235]  That statement *is* an actual clarification of defendant's statement.  However, the "clarification" of the simple fact — the chain of command — continues for more than two full pages, containing allegations of Stephenson's alleged discriminatory behavior and the hardships she wrought upon Chandler.[236]  Although those allegations

---

[233] Additionally, the citations to the record do not always support the facts alleged.  Moreover, the unwieldy method of citation used by plaintiff's counsel added unnecessary length to the fact section of the brief.  For example, the first citation to plaintiff's deposition, found in plaintiff's clarification of fact statement 2, reads:

Doc. 51-1, p. 4 at 11:17-23, 12, p. 5 at 13-16, p. 6 at 17-18, 19:1, p. 13 at 48:23, p. 14 at 49-51, 52:1-15, p. 16 at 57:5-23, 58-60, p. 17 at 61-63, 64:1-2, p. 18 at 65-68, p. 19 at 69-71, p. 36 at 137:11-23, 138:1-20, p. 37 at 141:22-23, 142-144, p. 38 at 145:1-22, p. 45 at 174:22-23, 175-176, p. 46 at 177, 178:1-13, p. 47 at 181:15-23, 182:1-9, 183:18-21, p. 50 at 193:11-23, 194-196, p. 51 at 197-198, 199:1-3.

Response in Opposition to Summary Judgment, at 1.  Although plaintiff's citation method is not technically incorrect, considerable time, space, and eye strain could have been saved if only deposition pages were listed, *i.e.* "Doc. no. 51-1, at 11-19, 48-52, 57-71, 137-38, 141-45, 174-78, 181-83, 193-99."

[234] Doc. no. 38 (Brief in Support of Summary Judgment), at 1.

[235] Response in Opposition to Summary Judgment, at 1.

[236] *See id.* at 1-4.

are certainly relevant to plaintiff's claim, they are *not* related to the statement of fact they purportedly "clarify."[237]

Additionally, the assertions plaintiff makes to deny and clarify defendant's statement of facts are often unnecessarily repeated in her own statement of facts.  For example, plaintiff's fact statements numbered 85 through 91 are essentially a repetition of the irrelevant information contained in her "clarification" of defendant's paragraph number 4.[238]  Plaintiff's fact statement number 109 is nearly identical to her "clarification" of defendant's paragraph number 29.[239]  Moreover, that "clarification" — that Chandler was discharged shortly after her deposition in 2011 — has nothing to do with defendant's actual statement — that Chandler filed an EEOC charge in 2009 — or this case, which does not include a wrongful termination claim.

In contrast to plaintiff's labyrinthine fact section, the legal argument section written by plaintiff's attorney is, as discussed more fully above, essentially a vacuum. The brief in this case is typical of the briefs Mr. Weathers has filed on behalf of other clients in other cases, and there is no reason to expect the quality of Mr. Weathers' briefing to improve anytime soon.  This court has grown weary of attempting to

---

[237] Similar problems exist with respect to plaintiff's response to defendant's statements of fact number 10 and 25.  *See* Brief in Support of Summary Judgment, at 2, 4; Response in Opposition to Summary Judgment, at 6, 10.

[238] *Compare* Response in Opposition to Summary Judgment, at 1-4 *with id.* at 20-21.

[239] *Compare id.* at 12 *with id.* at 23.

correct and compensate for the deficiencies of Mr. Weathers' briefs.  The court is sympathetic to the individuals who have chosen to retain Mr. Weathers as their attorney, because the consequence of that misguided choice is, more often than not, that  their potentially valid legal claims are not being adequately and professionally advocated.  Even so, this court has no further intention (unless it is otherwise advised by the Eleventh Circuit) of subsidizing Mr. Weathers' paydays by performing on his behalf the legal legwork that is necessary to argue a claim before a federal court.

Plaintiff's retaliation and hostile work environment claims will be dismissed due to her failure to offer any meaningful argument in opposition to defendant's motion for summary judgment on those claims.

### 2. Jurisdictional Prerequisites for disparate treatment claim

#### a. Failure to exhaust administrative remedies – Title VII claim

Defendant argues that plaintiff has failed to exhaust her administrative remedies with regard to many of the incidents she highlighted in her deposition as bases for her Title VII claim.[240]  Before commencing a lawsuit pursuant to Title VII, a plaintiff must first file a charge with the EEOC.  42 U.S.C. § 2000e-5(e)(1);[241] *see*

---

[240] Brief in Support of Summary Judgment, at 9-13.

[241] As originally enacted, Section 706(d) of the Civil Rights Act of 1964, 78 Stat. 260, provided in part:  "A charge under subsection (a) shall be filed within *ninety days* after the alleged unlawful employment practice occurred. . . ."  42 U.S.C. § 2000e-5(e) (emphasis supplied).  The 1972 amendments to Title VII added a new subsection (a) to § 706, however; and, as a consequence, subsection (d) was redesignated subsection (e).  In addition, the redesignated subsection (e) was

also, e.g., Alexander v. Fulton County, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge.").  The EEOC charge must be filed within 180 days of the events forming the basis of the charge.  See, e.g., Stafford v. Muscogee County Board of Education, 688 F.2d 1383, 1387 (11th Cir. 1982), overruled on other grounds by Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003).

"As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge. . . .  [A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge."  Cheek v. Western and Southern Life Insurance Co., 31 F.3d 497, 500 (7th Cir. 1994) (citations omitted).[242]

---

amended to enlarge the limitations period to 180 days.  See 86 Stat. 105, 42 U.S.C. § 2000e-5(e); see also United Air Lines, Inc. v. Evans, 431 U.S. 553, 555 n.3 (1977).

   A 300-day filing period applies if the charging party institutes proceedings in a so-called "deferral state," and first files a claim "with a State or local agency with authority to grant or seek relief" from unlawful employment practices.  42 U.S.C. § 2000e-5(e)(1); see also EEOC v. Commercial Office Products Co., 486 U.S. 107, 110 (1988).  "Deferral states" are those that prohibit the unlawful employment practice at issue and have established state or local authorities to grant or seek relief for such practice.  See 42 U.S.C. § 2000e-5(c).

   [242]As the Seventh Circuit has observed, "[t]his rule serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employer some warning of the conduct about which the employee is aggrieved."  Cheek, 31 F.3d at 500 (citations omitted).

"Nevertheless, because most EEOC charges are completed by laypersons rather than by lawyers, a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Id*. Stated differently, "the specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970).[243]

Instead, the claims that may be alleged in a judicial complaint are limited by four boundaries: (i) the specific claims alleged in the underlying EEOC charge;[244] (ii) those claims which are "like or reasonably related to" those alleged in the underlying charge;[245] (iii) the scope of the EEOC investigation that can reasonably be expected

---

[243]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[244]*See*, *e.g.*, *Alexander*, 207 F.3d at 1332 ("The starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation.").

[245]*E.g.*, *Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5th Cir. 1971) ("[T]he complaint in the civil action may properly encompass any discrimination *like or reasonably related to* the allegations [contained in the EEOC] charge and growing out of such allegations.") (emphasis supplied) (citations and internal quotation marks omitted); *Sanchez*, 431 F.2d at 466 ("[T]he allegations in a judicial complaint filed pursuant to Title VII 'may encompass any kind of discrimination *like or related to* allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission.'") (quoting *King v. Georgia Power Co.*, 295 F. Supp. 943, 947 (W.D. Ga. 1968)) (emphasis supplied); *see also*, *e.g.*, *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (*en banc*) (quoting *Danner*, *supra*).

to grow out of the charge of discrimination;[246] and (iv) those discriminatory acts

which were in fact considered during the EEOC's investigation.[247]

> The logic of this rule is inherent in the statutory scheme of Title VII. A charge of discrimination is not filed as a preliminary to a lawsuit. On the contrary, the purpose of a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC. Once a charge has been filed, the Commission carries out its investigatory function and attempts to obtain voluntary compliance with the law. Only if the EEOC fails to achieve voluntary compliance will the matter ever become the subject of court action. Thus it is obvious that *the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation*. Within this statutory scheme, it is only logical to limit the permissible scope of the civil action to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

> A more exacting rule would be destructive of the logic of the statutory scheme, for it would impede the ability of the Commission to effect voluntary compliance. *If an alleged discriminator knew that a particular issue which was the subject of EEOC conciliation efforts could never be the subject of a civil action, his incentive toward voluntary compliance would be lessened*. . . .

*Sanchez*, 431 F.2d at 466 (emphasis supplied); *see also, e.g.*, *Evans v. U.S. Pipe & Foundry Company*, 696 F.2d 925 (11th Cir. 1983) ("[T]he Commission should have

---

[246]*E.g.*, *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994) (citing *Sanchez*, *supra*). As the Seventh Circuit observed, however, this "part of the test is difficult to apply because it requires speculation as to what the EEOC might or might not discover in the course of an investigation." *Cheek*, 31 F.3d at 500.

[247]*E.g., Cheek, supra*, 31 F.3d at 505 ("We may grant that, if the EEOC considered the allegation of sexual harassment against Crady to be a permissible amendment to Cheek's EEOC charge *and therefore investigated Crady's conduct*, the allegations of sexual harassment should be treated as if it were part of the charge."); *Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir. 1985).

the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts.").

Defendant asserts that only the allegations in the charge itself — not the allegations in either of plaintiff's EEOC intake questionnaires — should be considered in determining the proper scope of plaintiff's claims.  Plaintiff did not refute that argument in her brief.[248]   Indeed, the Eleventh Circuit has held that statements made on an EEOC intake questionnaire cannot expand the scope of an EEOC charge when: (1) the plaintiff did not allege any facts about the later-raised event in the narrative section of his EEOC charge; (2) the intake questionnaire was not verified; (3) the language of the questionnaire itself did not indicate that it would be considered a charge if the plaintiff subsequently filed a formal charge; (4) the plaintiff did, in fact, subsequently file a formal charge; (5) the defendant was not on notice of the supplemental allegations alleged in the questionnaire; and (6) the EEOC did not investigate any of the supplemental allegations set forth solely in the questionnaire. *Francois v. Miami Dade County, Port of Miami*, 432 F. App'x 819, 822 (11th Cir. 2011).  Here, it does not appear that either of plaintiff's intake

---

[248] In fact, the *only* reference in plaintiff's brief to defendant's exhaustion of administrative remedies argument is plaintiff's statement that § 1981 has a longer statute of limitations than Title VII.  *See* doc. no. 56 (plaintiff's brief in response to summary judgment), at 27.

questionnaires was verified.  Furthermore, the language of the questionnaire itself indicates that it is not intended to serve as a charge.  Specifically, the questionnaire cautions  claimants that if a formal charge is not filed within 180 days, they may lose their rights under Title VII.  Plaintiff did, in fact, later file a formal charge, and she failed to mention the events discussed in the questionnaire in the charge itself.  Finally, there is no indication that Volunteers was on notice of any of the allegations from the questionnaire during the administrative proceedings, or that the EEOC investigated any of the incidents discussed solely in the questionnaire.  The EEOC's Notice of Charge of Discrimination indicates the only attachment was a copy of the EEOC charge; it does not mention anything about intake questionnaires.  Based on all of the above, the only allegations for which it can be said that plaintiff has exhausted her administrative remedies are those that are asserted on the face of the charge itself, *i.e.,* (1) that confidential information about her had been leaked; (2) that her job at the Day Rehabilitation center had been given to a white employee; (3) that she had to do direct patient care that a white employee had refused to do; and (4) that she had been placed on administrative leave for allegedly abusing a patient.

It next must be determined whether those remaining allegations were timely asserted.  Plaintiff filed her EEOC charge on May 5, 2009.[249]  Thus, any events that

---

[249] *See* EEOC Charge, May 5, 2009.

occurred more than 180 days before that date (or, in other words, prior to November 6, 2008) cannot form the basis of her Title VII claim.  The evidence indicates that plaintiff lost her job at the Day Rehabilitation center on September 11, 2006, and that she last worked as a Behavioral Aide — the position that required her to perform direct patient care tasks that had been refused by white employees — in January of 2008.  Both of those events occurred outside the 180-day window and therefore will not be considered in support of plaintiff's Title VII claim.  Only plaintiff's allegations about being placed on administrative leave in April of 2009, and about her subordinates being improperly informed about the reasons for the leave shortly thereafter, are timely for Title VII purposes.

### b.      Statute of Limitations – Section 1981 claim

Plaintiff's claims are not grounded exclusively in Title VII; she also asserted them pursuant to 42 U.S.C. § 1981.  The standards of proof and analytical framework are the same under Title VII and § 1981.  *See, e.g.*, *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  However, neither the filing of an EEOC charge of discrimination within 180 days of the alleged unlawful employment practice nor "resort to Title VII's administrative machinery are . . . prerequisites for the institution of a § 1981 claim." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460 (1975) (citation omitted).  For the same reason, plaintiff's § 1981 claims are

not limited by the scope of her EEOC charge, or the investigation reasonably expected to come of it. Claims brought under § 1981 are subject to a four-year statute of limitations. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004).[250] Even under that extended limitations period, plaintiff's claim about being transferred from the Day Rehabilitation center and being replaced by a white employee on September 11, 2006 are untimely, as her complaint in this action was not filed until November 2, 2010, more than four years later. All of the other allegations asserted in plaintiff's EEOC charge, however, are timely.

### c.    Summary

Plaintiff's allegations about being transferred from the Day Rehabilitation center and replaced by a white employee on September 11, 2006 will be dismissed as untimely under both Title VII and § 1981. Under Title VII, only her claims for being placed on administrative leave in April of 2009, and for the sharing of confidential information about her leave, are timely. Those same claims are timely under § 1981, as is plaintiff's claim about being forced to accept direct care

---

[250] Some § 1981 claims are subject to analogous state statutes of limitations. *See Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n.16 (11th Cir. 1998) (citing Alabama Code § 6-2-38(l) for the proposition that § 1981 claims arising out of acts occurring in Alabama are governed by the state's general, two-year limitations period). Here, the parties are in agreement that the four-year limitations period applies. *See* doc. no. 62 (Reply in Support of Summary Judgment), at 7 ("[Volunteers] agrees that certain [claims] asserted by Chandler are subject to a four year statute of limitations under § 1981.") (bracketed alterations supplied).

assignments that had been refused by white employees. As Title VII and § 1981 have the same analytical frameworks, the court will consider all three of the allegations that remain under § 1981 in its analysis, but plaintiff will not be permitted any remedies available solely under Title VII on the claim about direct care assignments.

### 3. Discussion of disparate treatment claim

Plaintiff claims that Volunteers discriminated against her because of her race, but she does not assert that there is direct evidence of Volunteers' retaliatory motive. In the absence of direct evidence, a plaintiff typically must prove her claim by navigating the familiar *McDonnell Douglas* burden-shifting framework. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). Under that analysis, a plaintiff must first establish a *prima facie* case of disparate treatment, which creates a presumption of discrimination. To rebut the presumption, the employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that defendant's proffered reason is merely a pretext for unlawful discrimination. *See McDonnell Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.

Plaintiff relies upon the Eleventh Circuit's recent decision in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011), to assert that the *McDonnell Douglas* framework should be disregarded in this case because the "totality of the circumstances" indicates that defendant's actions toward plaintiff were racially motivated.[251]   In *Smith,* the Eleventh Circuit stated that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Id.* at 1328.   The white plaintiff in that case was unable to establish a *prima facie* case of race discrimination because he could not identify a similarly situated black "comparator" who was treated more favorably than he was. *Id.* at 1327-28.   Even so, the Eleventh Circuit held that the "convincing mosaic of circumstantial evidence" in the record gave rise to an inference of discrimination. *Id.* at 1328 (quoting *Silverman v. Board of Education of City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011)).   That "convincing mosaic of circumstantial evidence" included: (1) a backdrop of racial tension in the company following a racially-motivated

---

[251] Response in Opposition to Summary Judgment, at 31.   In support of that argument, plaintiff simply states: "Stephenson fostered an environment of pervasive racism, dishonesty, manipulation, and fear.   Discipline against black employees — including Chandler — was usually or mostly 'fabricated and concocted.'" *Id.*   Plaintiff does not identify any pertinent facts or cite to the record to support that line of reasoning.   However, her reliance on *Smith* presumably explains why she devoted significant portions of the fact section of her brief to the description of people and events unrelated to her particular claims.

shooting less than two years earlier; (2) an upcoming television news special expected to portray the company's handling of racism at the workplace, both before and after the shooting, in an extremely unflattering light; and (3) the company's inclusion of race in a human resources spreadsheet used in determining the appropriate disciplinary action for each employee (including the plaintiff) implicated in the distribution of a racist email. *Id.* at 1329-40.  Those factors demonstrated that the employer "had a substantial incentive to discipline white employees more harshly than black employees," and "consciously injected race considerations into its discipline decision making without an adequate explanation for doing so." *Id.* at 1341.

After a thorough review of the limited Eleventh Circuit case law elucidating the *Smith* decision, this court is not persuaded by plaintiff's argument that the *McDonnell Douglas* framework should be disregarded altogether.   Instead, subsequent Eleventh Circuit decisions have construed *Smith* as presenting an *alternative* method for proving a claim of race discrimination that allows the plaintiff to survive summary judgment even when she cannot establish all of the rigid elements of a *McDonnell Douglas prima facie* case.   As the Eleventh Circuit stated in *Hamilton v. Southland Christian School, Inc.,* 680 F.3d 1316 (11th Cir. 2012):

There is more than one way to show discriminatory intent using

> indirect or circumstantial evidence.   One way is through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S .Ct. 1817, 36 L .Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).   Another way is "present[ing] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."   *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir.2011).  A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination.   *See id.*   If the plaintiff presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination, her claim will survive summary judgment.   *Id.*

*Hamilton,* 680 F.3d at 1320.  Even though Hamilton, who was asserting a pregnancy discrimination claim, could not identify a similarly situated, non-pregnant comparator who was treated more favorably, the Eleventh Circuit held that she, nevertheless, could survive summary judgment because she had "enough non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination." *Id.* (citing *Smith,* 644 F.3d at 1328).  That evidence included derogatory comments from the defendant school's administration about Hamilton's need to take maternity leave due to her pregnancy.  *Id.* at 1320-21.  *See also Chapter 7 Trustee v. Gate Gourmet, Inc.,* 683 F.3d 1249, 1255-56 (11th Cir. 2012) (holding that a pregnancy discrimination plaintiff had sufficient circumstantial evidence to survive summary judgment, despite her failure to identify a similarly situated comparator, when the plaintiff's supervisor fired her without even giving her the opportunity to switch to

a light-duty job, the Human Resources manager admitted in deposition that the plaintiff's pregnancy was a "substantial or motivating factor" in the decision to terminate her employment, and plaintiff did not have any performance or disciplinary problems on her record).

In light of this authority, the court will consider whether plaintiff has presented sufficient evidence to survive summary judgment under *either* the *McDonnell Douglas* burden-shifting framework, *or* under the framework set forth in the *Smith* decision. Applying those alternative standards, the court finds that plaintiff has raised genuine issues of material fact with regard to racially disparate treatment, and that summary judgment is due to be denied on her remaining disparate treatment claims (*i.e.,* claims about being forced to accept direct care assignments that had been refused by white employees, being placed on administrative leave in April of 2009, and for the sharing of confidential information about her leave). Only the last two of those claims may be pursued under Title VII, but all three remaining claims may be pursued pursuant to 42 U.S.C. § 1981.

### III.  CONCLUSION AND ORDERS

In accordance with the foregoing, defendant's motion to strike is GRANTED in part and DENIED in part.  Plaintiff's statement in her September 30, 2011 declaration that Teresa Stephenson created the Behavioral Aide Services job for

her is STRICKEN.  In all other respects, the motion to strike is DENIED.

Defendant's motion for summary judgment also is GRANTED in part and DENIED in part.  Plaintiff's claims for retaliation and hostile work environment are DISMISSED with prejudice.  Plaintiff will be allowed to proceed with the following aspects of her disparate treatment claim:  (1) being forced to accept direct care assignments that had been refused by white employees; (2) being placed on administrative leave in April of 2009; and (3) the sharing of confidential information about her leave.  Only the last two of those claims may be pursued under Title VII, but all three remaining claims may be pursued pursuant to 42 U.S.C. § 1981.  In all other respects, plaintiff's disparate treatment claim is DISMISSED.  The court will set a pretrial conference and trial on the remaining aspects of plaintiff's disparate treatment claim by separate order.

DONE and ORDERED this 28th day of February, 2013, *nunc pro tunc* to September 28, 2012.

_____
United States District Judge